**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**BRYAN NORRIS and
NORRIS FOR ARKANSAS**                                                    **PLAINTIFFS**

**V.**                    **CASE NO. 5:26-CV-5005**

**TIM GRIFFIN, in his official capacity
as Attorney General of Arkansas, and
COLE JESTER, in his official capacity
as Secretary of State of Arkansas**                              **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Bryan Norris, a candidate for the Republican Party's nomination for Arkansas Secretary of State, moves to enjoin enforcement of Act 728 of 2021 (Ark. Code Ann. § 7-1-103(a)(24)), which prohibits entering or remaining in an area within 100 feet of a polling location except for purposes of voting.[1]  The Court held an evidentiary hearing on the motion on February 26, 2026.  For the reasons below, the Motion for Preliminary Injunction (Doc. 5) is **DENIED**.

## I.    BACKGROUND

In 2021, the Arkansas General Assembly enacted Act 728, which provides that "[a] person shall not enter or remain in an area within one hundred feet (100') of the primary exterior entrance to a building where voting is taking place except for a person entering or leaving a building where voting is taking place for lawful purposes."

Mr. Norris announced his campaign for Secretary of State on June 19, 2025.  *See* Doc. 19, p. 8 n.1.  He seeks the Republican Party's nomination for that office during the

---

[1] The Court has considered the Motion for Preliminary Injunction (Docs. 5 & 6) by Mr. Norris and Norris for Arkansas, the State government's Response in Opposition (Doc. 19), and Mr. Norris and his campaign's Reply (Doc. 23).

March 3, 2026, primary election.  On January 6, 2026, Mr. Norris's campaign contracted with polling and survey company Rasmussen Reports, LLC to conduct exit polling in seven Arkansas counties. (Doc. 2-10).  But Rasmussen's obligation to conduct exit polling is contingent upon Mr. Norris securing a "binding court ruling invalidating [Act 728] as applied to exit polling by February 17, 2026, or two weeks before the primary election.  *Id*. ¶ 2.2.  Mr. Norris filed this lawsuit challenging the constitutionality of Act 728 on January 8, 2026.  *See* Doc. 2.

The Honorable Susan O. Hickey recused from the case on February 12, 2026, *see* Doc. 24, and it was transferred to the undersigned on the same day.  Although Plaintiffs previously argued they would suffer an irreparable injury absent a grant of relief by February 17th, the harm apparently became reparable the day after the matter was transferred, when Rasmussen agreed to extend its deadline under paragraph 2.2 to February 27, 2026.  (Doc. 25).  The amendment also newly gives Rasmussen the right to subcontract the exit polling to an "Arkansas-based organization" in order to meet its March 3 exit polling obligations.  So, although Mr. Norris has assured the Court that any polling on March 3 would be conducted independently by a "nationally prominent, reputable polling firm," there is nothing in the record before the Court that guarantees Rasmussen would conduct the polling or that the subcontractor would be unaffiliated with Mr. Norris or his campaign.

Mr. Norris moves to enjoin Defendants' enforcement of Act 728 against him, arguing that Act 728 as applied to his intended exit polling runs afoul of the First Amendment.

## II.    LEGAL STANDARD

In determining whether to grant a motion for preliminary injunction, the Court must weigh the following four considerations: (1) the threat of irreparable harm to the moving party; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant if the injunction is denied and the harm to other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  When a plaintiff seeks to "enjoin the implementation of a duly enacted state statute," they must meet a more rigorous standard on the second prong by showing that they are "likely to prevail on the merits."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc).  "While no single factor is determinative, the probability of success factor is the most significant."  *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1133 (8th Cir. 2019) (citation and quotation omitted). In particular, "[w]hen a Plaintiff has shown a likely violation of his or her First Amendment rights, the other requirements for obtaining a preliminary injunction are generally deemed to have been satisfied." *Phelps-Roper v. Troutman*, 662 F.3d 485, 488 (8th Cir. 2011) (per curiam), *vacated on reh'g on other grounds*, 705 F.3d 845 (8th Cir. 2012).

## III.    DISCUSSION

### A.  Likelihood of Success on the Merits

The First Amendment protects the people from laws "abridging the freedom of speech."  Sometimes, a law will regulate speech, conduct, or both at the same time.  Even ostensibly neutral statutes that do not distinguish between speakers or viewpoints can still operate to restrict speech: For example, statutes which are "directed at activity with no expressive component" but "impose a disproportionate burden upon those engaged in

3

protected First Amendment activities" are sometimes subject to First Amendment scrutiny. *See Tiktok Inc. v. Garland*, 604 U.S. 56, 68 (2025) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986)). The Court's determination is based on the "particular activity in which an actor seeks to engage." *Ness v. City of Bloomington*, 11 F.4th 914, 923 (2021).

The first issue before the Court, then, is whether Act 728 implicates the First Amendment at all. The Supreme Court has "not articulated a clear framework for determining whether a regulation of non-expressive activity that disproportionately burdens those engaged in expressive activity triggers heightened review." *Tiktok Inc.*, 604 U.S. at 68. Nonetheless, because the issue before the Court is only whether Act 728 is unconstitutional *as applied to Mr. Norris*, the Court assumes for purposes of this Order that First Amendment scrutiny applies. *See Daily Herald Co. v. Munro*, 838 F.2d 380 (1988) (finding that exit polling is speech when invalidating content-based statute which prohibited exit polling specifically within 300 feet of a polling place).

To determine the appropriate level of scrutiny that applies, the Court must also determine the speech's forum. Here, too, the Court assumes without deciding that Act 728 regulates speech in a public forum. Although the Supreme Court has also not determined whether the sidewalks surrounding polling places are public or private forums, the Court assumes here (in line with the plurality in *Burson*) that the level of scrutiny appropriate for public forums applies here. *See Burson v. Freeman*, 504 U.S. 191, 196 (1992) (plurality opinion). The Court does so only to show that even under the stricter standard applicable to regulations of speech in public forums, Act 728 is constitutional.

In traditional public forums, the government may impose reasonable time, place, and manner restrictions on expressive activity so long as the restrictions are "content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternatives for communication." *Id*. at 197. Act 728 likely meets these requirements.

The Court begins with whether Act 728 is content neutral. A law is facially content-based when it "applies to particular speech because of the topic discussed or the idea or message expressed." *Tiktok*, 604 U.S. at 70 (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Facially content neutral regulations, however, will still be treated as content-based if they cannot be "justified without reference to the content of the regulated speech" or if they were "adopted by the government because of disagreement with the message the speech conveys." *Id*. (citation modified). Here, the Court comes to the easy decision that the statute is content neutral. The statute does not "target particular speech based upon its content." *Id.* at 71. It does not "impose a restriction, penalty, or burden by reason of content" on Mr. Norris or his campaign, nor could he and his campaign "avoid or mitigate" the effects of Act 728 by altering their speech. *Id.* Nothing about the Act regulates speech "because of the topic discussed, or the idea or message expressed." *Id*. The Act also does not restrict based on the identity of the speaker, except for providing a carve-out for would-be voters. It does not distinguish between political speakers and other speakers, but instead forbids essentially *all* activity within 100 feet of a polling location. *See McCullen v. Coakley*, 573 U.S. 464 (2014) (finding a geographic buffer zone around abortion clinics content neutral because "whether petitioners violate the Act

depends not on what they say but simply on where they say it") (citation modified).  The Act is clearly content neutral.[2]

Act 728 is also narrowly tailored to serve a significant government interest.  As the *Burson* Court explained, regulations that impose restricted areas in or around polling places arise form issues in our country's earliest elections.  *Burson*, 504 U.S. at 200.  During the colonial period, government officials were elected through a public show of hands, which presented opportunities for "bribery and intimidation."  *Id*. at 200.  States switched to paper ballots in response, but over time, political parties began to produce their own ballots for voters marked with "flamboyant colors, distinctive designs, and emblems" so that they were easily recognizable at a distance.  *Id*.  The earlier problems of bribery and intimidation thus "reinfected the election process," as vote buyers could watch voters as they placed the ballot in the polling box to ensure their bribe was effective.  *Id.*  A voter's experience at the ballot box was marked by "party ticket peddlers" engaged in heated competition, and all-in-all "these early elections were not a very pleasant spectacle for those who believed in democratic government."  *Id*. at 202 (citation modified).

In the years that followed, countries across the world moved to the "Australian system" of voting, which provided for an official ballot with all candidates as well as polling booths open only to election officials, election monitors, and voters.  *Id*. at 203.  This system of restriction—intended to prevent "bribery, intimidation, disorder, and inefficiency at the polls"—made its way to the United States in 1888 as Louisville, Kentucky, the Commonwealth of Massachusetts, and the State of New York adopted the Australian

---

[2] Plaintiffs conceded as much during the hearing.  *See* also Doc. 23, p. 11.

system.  *Id*.  Massachusetts and New York only restricted the public from entering the six-foot area surrounding the voting compartments under the theory that it provided "additional monitoring by members of the general public and independent candidates, who in most States were not allowed to be represented by separate inspectors."  *Id*. at 204.  The New York statute, like Arkansas Code § 7-1-103(8), also prohibited any person from "electioneering on election day within any polling place, or within one hundred feet of any polling place."  *Id*.

But as *Burson* recognizes, the Massachusetts and New York laws were but one choice among the many available.  The Louisville law "prohibited all but voters, candidates, or their agents, and electors from coming within 50 feet of the voting room inclosure," or, in other words, prohibited more than just electioneering like Act 728.  *Id*.  A tidal wave of similar laws swept through the remainder of the United States, and "by 1896, almost 90 percent of the States had adopted the Australian system."  *Id*. at 204.  Tennessee, like Louisville, Kentucky, initially forbid everyone but voters and certain election officials from being "within 50 feet of the entrance" of the polling location in order to "secure the purity of its elections."  *Id*. at 205.

So, while *Burson* only dealt with statutes that forbid electioneering within 100 feet of a polling location, it also recognized that bills like Act 728 are rooted in our nation's history and tradition.  Although the *Burson* Court held—in response to an argument that the statute at issue there was underinclusive—that there was "simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses," it certainly did not reach the issues in this case.  *Id.* at 207.

As explained below, on the record presently before the Court, Arkansas *has* demonstrated past and potential electoral abuses driving a total 100-foot restriction. Further, and as *Burson* recognized, intimidation and interference with voters may often go undetected and may drive away voters before remedial action can be taken. *Id*. at 206. Moreover, "intimidation and interference laws" (or in this case, electioneering laws) "fall short of serving a State's compelling interests because they deal with only the most blatant and specific attempts to impede elections." *Id*. at 207 (citation modified). While the "First Amendment does not require States to regulate for problems that do not exist," it also does not require that States must ignore problems once they arise. *Id*. *Burson* cautioned that in election cases in particular, States need not prove that their regulations are "perfectly tailored to deal with voter intimidation and election fraud," because without prophylactic regulation, the State is left to deal with a tainted election, potentially reduced voter turnout, and damage to the political system. *Id*. at 209.

The Court thus considers the State's asserted interest in preventing disruption and interference in elections in light of *Burson*'s warnings. Here, the State has *already* identified an actual issue with individuals remaining within the one-hundred-foot zone of a polling place. In Senate floor debates, the legislature expressed a concern that individuals remaining within the one-hundred-foot zone for ostensibly neutral reasons might be "affiliated with groups that were there maybe for other reasons." *See* Doc. 2-7, p. 4. In this case, the legislature's concerns seem prescient: Two individuals were arrested in Independence County during the November 2024 general election for what they called "exit polling," while at the same time advocating for the use of paper ballots (e.g., electioneering). The arrests came only after multiple voter complaints. (Doc. 2-9).

The Court also notes that the amended contract here only solidifies the State's concerns: Although Mr. Norris contracted with Rasmussen to conduct exit polling, Rasmussen apparently has the right to subcontract all operations to an Arkansas firm. While the Court has no reason to discredit Mr. Norris' affidavit, which states that neither he nor his campaign will be involved in carrying out exit polling or staffing exit polling, *see* Doc. 23-1, the Court also recognizes that in modern elections, someone can be officially unaffiliated with a campaign while operating on their behalf. During the motion hearing, it was established that Conrad Reynolds—one of the individuals arrested in 2024 for electioneering under the guise of exit polling—was involved in crafting exhibits for Mr. Norris's witnesses. This certainly does not assuage the Court's concerns in this case. Arkansas's stated concern of preventing voter intimidation and influence operating under some other guise (like exit polling, or as Plaintiffs argue, passing out refreshments) is a significant government interest.

Finally, Act 728 is narrowly tailored towards that interest and leaves open ample alternatives for communication. For a content neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests. *McCullen*, 573 U.S. at 486. These regulations "need not be the least restrictive or least intrusive means of serving the government's interests," but the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (citation modified).[3] At bottom, narrow tailoring is satisfied "so long as

---

[3] Plaintiffs argue that the tailoring requirements for content-neutral and content-based restrictions are equivalent. Plaintiffs' own cited authorities prove this is wrong. *See* Doc. 23, p. 16 ("A content-based statute that regulates speech in a public forum is constitutional

the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989) (citing *United States v. Albertini*, 472 U.S. 674, 689 (1985)).

Act 728 is sufficiently tailored by this standard.  The Court again notes that, in the context of voter regulations, a State does not have to prove that its regulations will benefit the political system using empirical evidence.  *Burson*, 504 U.S. at 208–09.  Arkansas has decided that the "last 15 seconds before its citizens enter the polling place" remain a voter's time, "as free from interference as possible."  *Id*. at 210.  Although Arkansas has opted to bar more activity than Plaintiffs might like to promote the integrity of its election system, this interest would be achieved less effectively absent the regulation.  This is the rare case where the "exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud." *Id*.  As in *Burson*, the Court finds that both history and common sense suggest Arkansas has sufficiently tailored its Act to protect speech rights.  *Id*. at 211.

Similarly, and as in *Burson*, the Court finds that Act 728 leaves open ample alternatives for communication.  Exit pollers, refreshment purveyors, and any other speakers remain free to influence voters beyond the one hundred foot mark.  The Court is not persuaded by Plaintiffs' affidavits which suggest exit polling beyond one hundred feet is not viable.  (Docs. 2-2, 2-3).  Although the Court can appreciate that Act 728 might have an impact on exit polling error rates, whatever effect the Act might have on exit polling accuracy does not override Arkansas's interest in free and fair elections.  Further,

---

only if it ***is narrowly tailored*** to accomplish a compelling government interest . . . ***and is the least restrictive means available***.") (citing *Daily Herald Co. v. Munro*, 838 F.2d at 385) (first emphasis in original).

Mr. Lenski's testimony at the hearing did not seem to suggest that exit polling at the one hundred foot mark would introduce bias or skew so as to disrupt the accuracy of exit polling in a particular location—his answers did not suggest there is an appreciable difference between voters who would respond to an exit poll at Act 728's boundary as opposed to those responding immediately once they leave the door.  Although the Court appreciates Mr. Lenski's explanation that Act 728 could skew exit polling results across a precinct, as results might be biased by the particular qualities of a location where it is feasible to exit poll one hundred feet out, this again does not suggest that exit polling would be *impossible*.  One hundred feet is six feet longer than a standard basketball court, roughly a third of a football field, and in many locations in Arkansas, likely no further than the walk from the polling location to the parking lot.  Although Act 728 might complicate matters for Mr. Norris and his campaign, the Court is not persuaded that it closes off all avenues of communication.  While there may of course be some distance where Act 728 would present an impermissible burden on speech, "it is sufficient to say that in establishing a 100-foot boundary, [Arkansas] is on the constitutional side of the line." *Burson*, 504 U.S. at 211.

Of course, none of this is to suggest that the Court considers the legislature's choice here to be *wise*.  Perhaps instead of stamping out voter intimidation, the modification here will reduce the public and independent candidates' ability to monitor the election process, as the *Burson* Court suggested.  504 U.S. at 203–04.  But under the law, a statute must only be narrowly tailored to serve a significant state interest and leave open ample alternatives for communication.  In our system, judges and courts are meant to be "loyal adherents of the democratic idea, the sovereignty of a people expressing itself

by representatives," and not wielders of "double axes" with one edge in "control over legislation by its unconstitutionality" and in the other "such free interpretation of statutes as suits their purposes."  Learned Hand, Book Review, 37 Pol. Sci. Q. 149, 149 (1922) (reviewing Edouard Lambert, Le Gouvernement Des Juges Et La Lutte Contre La Législation Sociale Aux États-Unis (1921)).  As the statute here passes constitutional muster, the Court's role is at its end, at least for the time being.  Defendants are likely to prevail on the merits.

### B.  Remaining Preliminary Injunction Factors

The remaining preliminary injunction factors also weigh against Mr. Norris.  As he argues, it is "well-established that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Powell v. Noble*, 798 F.3d 690, 703 (8th Cir. 2015). However, as the Court has concluded that Mr. Norris is "unlikely to succeed in showing his First Amendment rights have been violated," he has "not shown a threat of irreparable harm that warrants preliminary injunctive relief."  *Id*.  And as the Court finds that Mr. Norris and his campaign are "unlikely to succeed on the merits of his First Amendment claim and ha[ve] not shown irreparable harm," the Court does not need to address the remaining preliminary injunction factors.  *Id.*  In any event, because Mr. Norris's First Amendment claim is likely not meritorious, it cannot outweigh the State's interest in "lawfully managing its elections."  *Eggers v. Evnen*, 48 F.4th 561, 567 (8th Cir. 2022) ("When a plaintiff seeks an injunction against the enforcement of a state statute, the plaintiff's failure to carry his burden on the likelihood-of-success factor is fatal to his case.").

## IV.    CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 5) is **DENIED**.

**IT IS SO ORDERED** on this 27th day of February, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE