**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**BRYAN NORRIS and**
**NORRIS FOR ARKANSAS**                                                  **PLAINTIFFS**

**V.**                                     **CASE NO. 5:26-CV-5005**

**TIM GRIFFIN, in his official capacity**
**as Attorney General of Arkansas, and**
**COLE JESTER, in his official capacity**
**as Secretary of State of Arkansas**                                    **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

Bryan Norris, a candidate for the Republican Party's nomination for Arkansas Secretary of State, seeks to permanently enjoin enforcement of Act 728 of 2021 (Arkansas Code § 7-1-103(a)(24)), which prohibits entering or remaining in an area within 100 feet of a polling location except for purposes of voting.  Defendants Tim Griffin and Cole Jester (the "State") now move for Judgment on the Pleadings (Doc. 47), which Mr. Norris and his campaign oppose (Doc. 53).  In the meantime, Mr. Norris and his campaign moved for leave to file an amended complaint (Doc. 52) to which the State filed no response.  The Court also requested—and the parties submitted—supplemental briefing on whether Mr. Norris continues to have standing to bring his case.  *See* Docs. 54 & 55. For the reasons below, the Motion for Judgment on the Pleadings (Doc. 47) is **GRANTED,** and Mr. Norris's Motion for Leave to File an Amended Complaint is **DENIED** because amendment would be futile.

1

## I.   BACKGROUND

### A.   Act 728

In 2021, the Arkansas General Assembly enacted Act 728, codified at Ark. Code. Ann. § 7-1-103(a)(24), which provides that "[a] person shall not enter or remain in an area within one hundred feet (100') of the primary exterior entrance to a building where voting is taking place except for a person entering or leaving a building where voting is taking place for lawful purposes."

Act 728 was motivated by alleged complaints that nonpartisan organizations and their employees were electioneering and disrupting polling operations under the guise of "voter support" efforts.  The complaints stated that groups were handing out food and water to voters, but the legislature's concerns swept broader.  As one supporter of the bill noted during debate, the Act was intended to create a 100-foot "sacred zone" to prevent electioneering from occurring "under the pretense of goodwill."  *See* Doc. 44-7, pp. 4–5. Justifications for the 100-foot safe zone included: "preventing voters from being harassed or blocking an entrance," *id*. p. 6; upholding "election integrity at every single level," *id*. p. 8; and preventing people from congregating around the polling site, (Doc. 44-8, p. 8). Although legislators recognized during the debate that much of the allegedly partisan activity that was the basis for the citizen complaints was already prohibited by Arkansas's electioneering statute, they nonetheless justified Act 728 as a precautionary measure made necessary by the difficulties of enforcing the statute already on the books.  Senator Jason Rapert spoke in favor of Act 728 because "it's hard to stop" electioneering when someone claims to be nonpartisan, so it was unfortunately necessary to bar the activity "wholly altogether."  (Doc. 44-7, p. 10).  Representative Karilyn Brown made clear that the

2

conduct the legislature was concerned about was not organizations "passing out water or sandwiches" which formed the basis of the citizen complaints, but instead all activities which "quite easily *could* be electioneering," as poll workers have "their hands full" enforcing election statutes. (Doc. 44-8, pp. 4–5).

Act 728 has since been enforced against two individuals—Conrad Reynolds and Dustin Black—who the State has alleged were advocating for the use of paper ballots under the guise of "exit polling" thirty feet from a polling location. *See* Doc. 44-9.

### B.    This Case

Plaintiff Bryan Norris is a candidate for Arkansas Secretary of State. *See* Doc. 19, p. 8 n.1. He sought the Republican Party's nomination for that office during the March 3, 2026 primary election.  Mr. Norris filed this lawsuit on January 8, 2026, asserting a violation of his First Amendment rights. *See* Doc. 2. Mr. Norris simultaneously moved to preliminarily enjoin the State's enforcement of Act 728 against him so that he could conduct exit polling in the primary, arguing that Act 728 as applied runs afoul of the First Amendment.  After an evidentiary hearing on February 26th, the Court denied his motion. *See* Doc. 39.

Mr. Norris then finished first in the March 3 primary election.  (Doc. 44, ¶ 1). However, because no candidate obtained a majority of votes, the election proceeded to a runoff. *Id*.  Mr. Norris then filed an Amended Complaint, and the State filed its Motion for Judgment on the Pleadings.  (Docs. 44, 47).

In the end, Mr. Norris lost the March 31, 2026, runoff election.  Nonetheless, he has made plans to conduct exit polling during the November 3, 2026 general election.  As alleged in Mr. Norris's proposed Second Amended Complaint, he also plans to seek the

3

Republican nomination for Arkansas Secretary of State during the March 5, 2030, primary election, and he intends to keep his state campaign committee active for that reason.

For the November 3, 2026, general election, Mr. Norris has entered into a contract with Arkansas Voter Integrity Initiative, Inc. to conduct exit polling in at least seven Arkansas counties: Benton, Craighead, Faulkner, Pulaski, Saline, Sebastian, and Washington.  *See* Doc. 52, p. 27.  Arkansas Voter Integrity Initiative Inc.'s President is Conrad Reynolds, one of the two individuals who Act 728 was previously enforced against for his alleged electioneering under the auspices of exit polling.  Under the agreement with Mr. Norris and his campaign, Arkansas Voter Integrity Initiative will publish the results of its exit polling on its website and X.com account and make the results available to Arkansas-based news outlets that wish to publish the organization's exit polling outcomes.  *Id*.  The agreement requires Arkansas Voter Integrity Initiative to conduct at least one hour of training on the rules and regulations applicable to conduct surrounding polling places on election day.  Among other things, the training emphasizes that exit pollsters should not electioneer or impede voters' access to a polling place.  *Id*. at p. 28.

## II.    LEGAL STANDARD

A party seeking a judgment on the pleadings under Federal Rule of Civil Procedure 12(c) will be granted relief when "the moving party has clearly established that no material issue of fact remains and the moving party is entitled to judgment as a matter of law." *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004).

Motions for judgment on the pleadings under Rule 12(c) are governed by the same legal standard that applies to motions to dismiss under Rule 12(b)(6). *See Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). To survive a motion to dismiss, a

complaint must provide "a short and plain statement of the claim that [the plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Court must accept all factual allegations in a complaint as true and construe them in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiffs' favor.  *See Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). When considering a motion under Rule 12(c) the Court's review is generally confined to the pleadings, but it may also consider "some materials that are part of the public record or do not contradict the complaint" and materials that are "necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citing 5A Wright & Miller's Federal Practice & Procedure § 1357, at 299 (2d. ed. 1990)).

### III.    DISCUSSION

### A.    Standing

The first issue before the Court is whether there remains a justiciable controversy for the Court to decide with Mr. Norris having lost the March 2026 primary.  *See Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021) ("Under Article III of the Constitution, we may adjudicate only actual, ongoing cases or controversies.  When the issues presented in a case are no longer live, the case is moot and is therefore no longer a 'Case' or 'Controversy' for purposes of Article III." (citation omitted)).  Both parties agree—as does

the Court—that Mr. Norris continues to have standing to bring this action as a result of his plans to exit poll during the 2026 general election and 2030 primary.

## B.    Act 728 Regulates Speech

The First Amendment protects the people from laws "abridging the freedom of speech."  That commitment is perhaps at its greatest for speech concerning public affairs—the "essence of self-government"—the protection of which embodies our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) (citation modified).  But not all laws are put to First Amendment review: non-expressive conduct, for example, is not protected by the Free Speech Clause.  *See Redlich v. City of St. Louis*, 51 F.4th 283, 288 (8th Cir. 2022) ("The Supreme Court has extended First Amendment protection only to conduct that is inherently expressive.") (citation omitted).

Sometimes, a law will regulate speech, conduct, or both at the same time.  Even ostensibly neutral statutes that do not distinguish between speakers or viewpoints can still operate to restrict speech: For example, statutes which are "directed at activity with no expressive component" but "impose a disproportionate burden upon those engaged in protected First Amendment activities" are sometimes subject to First Amendment scrutiny. *See Tiktok Inc. v.* Garland, 604 U.S. 56, 68 (2025) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986)).  The Court's determination is based on the "particular activity in which an actor seeks to engage."  *Ness v. City of Bloomington*, 11 F.4th 914, 923 (2021).

The State contends that Act 728 regulates only conduct, not speech, and the conduct that it does regulate is not inherently expressive.  The State's argument, however,

6

appears to treat the issue as if Mr. Norris is challenging Act 728 on its face (i.e., he is attempting to establish that no set of circumstances exist under which it would be valid) and not challenging Act 728 as it is applied against him.  The distinction is important because the State relies principally on *Virginia v. Hicks*, 539 U.S. 113, 123 (2003) for the proposition that Act 728 does not implicate the First Amendment, a case that involved an overbreadth challenge to a Virginia trespassing statute.  But as the Supreme Court explained there, "[t]he First Amendment doctrine of overbreadth is an exception to our normal rule *regarding the standards for facial challenges.*"  *Id.* (emphasis added).  *Hicks*'s reasoning is inapplicable here, where Mr. Norris does not seek to invalidate "*all* enforcement of [Act 728]."  *Id*.

The State argues in the alternative that if the First Amendment does come into play under Act 728, it is because Act 728 regulates expressive conduct.  There is at least some question here, as exit polling does combine "speech" and "nonspeech" elements in the same course of conduct, which is required for the "relatively lenient standard" outlined in *United States v. O'Brien*, 391 U.S. 367 (1968) to apply.  *See Texas v. Johnson*, 491 U.S. 397, 407 (1989).[1]  Yet *O'Brien* applies only "to those cases in which 'the governmental interest is unrelated to the suppression of free expression,'" which is plainly not the case here.  The State justifies Act 728 as an "anti-influence prohibition" meant to ensure that voters are free from "intimidation, threat, improper influence, or coercion."  How, then, can one 'influence' another person's beliefs or conduct without communicating or expressing

---

[1] Under *O'Brien*, government regulation of conduct is justified where it is "within the constitutional power of the Government," "furthers an important or substantial government interest," where the interest is "unrelated to the suppression of free expression," and "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *O'Brien*, 391 U.S. at 377.

a message? At least in the case of Mr. Norris's proposed exit polling, "these [anti-influence] concerns blossom only when" the exit pollster "communicates some message, and thus are related 'to the suppression of free expression' within the meaning of *O'Brien*." *Id*. Indeed, Act 728's prophylactic attempts to address electioneering make sense *only* if the Act is seeking to prioritize some speech and expression over others—here, the State has prioritized the right to vote over the right of campaigns and pollsters to communicate with and influence voters.

The Court thus comes to the easy conclusion that, at least as applied to Mr. Norris, Act 728 regulates speech.

### C.    Act 728 is Constitutional

Having determined that Act 728 regulates speech, the Court must next determine the appropriate level of constitutional scrutiny to apply. Because the ban applies only in a specific location (the 100 feet surrounding a polling place), the Court must first determine the speech's forum. *See Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (when the government seeks to place restrictions on its property, courts conduct forum based First Amendment analysis). The law recognizes three types of government-controlled spaces, or forums: "traditional" public forums, traditionally used for public communication, "designated" public forums, which have been intentionally opened up for that purpose, and "nonpublic" forums, which are "not by tradition or designation a forum for public communication." *See Minnesota Voters Alliance v. Mansky*, 585 U.S. 1, 12 (2018). The notion of "tradition" in a traditional public forum is ill-defined, and the Supreme Court has taken two approaches to try to give the term some life—one looks to a forum's purpose and function, *see, e.g., Int'l Soc. For*

8

*Krishna Consciousness,* 505 U.S., and the other to the forum's historical use and regulation, *see*, *e.g.*, *Burson v.* Freeman, 504 U.S. 191 (1992).

As the State notes, Mr. Norris does not engage in forum-based analysis. The State does only a cursory analysis, but urges the Court to adopt the view that the public sidewalks and streets surrounding a polling place are nonpublic forums, at least on the day of an election. If the State is correct, the Court applies a less stringent standard of review because the government "no less than a private owner of property, retains the power to preserve the property under its control for the use to which it is lawfully dedicated." *Mansky*, 585 U.S. at 12 (cleaned up).

While the Supreme Court has determined that on Election Day, the *interior* of a polling location is a nonpublic forum, it has yet to definitively determine whether the "public sidewalks and streets *surrounding* a polling place qualify as a nonpublic forum." *Id*. On non-election days, these areas occupy a "special position in terms of First Amendment protection because of their historic role as sites for discussion and debate." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014). They enjoy this status because they have "immemorially been held in trust for the use of the public land and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Committee for Indus. Organization*, 307 U.S. 496, 516 (1939). But although Justice Roberts in *Hague* gave public sidewalks and streets pride of place as the first public forum so-recognized by the Supreme Court, there was always a problem: no historical analysis was done in *Hague*, and it is unclear whether sidewalks and streets have actually been held in public trust "immemorially," or just since

9

1939 when the case was decided.  Moreover, *Hague* offers little help where the historical record is mixed or where regulation has evolved over time, as it has here.

Justice Scalia's concurrence in *Burson* tackles this issue head on. Although *Hague* propped up the sidewalk and public street as the quintessential public forum, statutes like Act 728 have a "long history of general use," at least post-Reconstruction.  *Burson*, 504 U.S. at 215.  "By 1900 [39 years before *Hague* was decided], at least 34 of the 45 States . . . had enacted" viewpoint neutral restrictions on election day-speech within a specified distance of a polling place.  *Id*.  Thus, as Justice Scalia concluded, the "streets and sidewalks around polling places have traditionally *not* been devoted to assembly and debate."  *Id*.  The Supreme Court has determined too that not every street or sidewalk is a public forum—sidewalks on military bases, for example, are nonpublic forums because the notion that they have "traditionally served as a place for free public assembly and communication of thoughts by private citizens" is "historically and constitutionally false." *Greer v. Spock*, 424 U.S. 838, 838 (1976).  Even the *Burson* plurality, which determined in passing that sidewalks surrounding election locations are public forums, noted that by 1896, almost 90 percent of States had transitioned from a system where voters cast public paper ballots surrounded by partisans—something like a fan in a burnt orange Longhorn jersey wading through a sea of red at Razorback stadium—to a secret ballot system. *Burson*, 504 U.S. at 202.  If there was a tradition of public assembly outside of election places, States did their best to end that tradition before the start of the 20th century.

The Court therefore concludes that, like the interior of a polling location, the area surrounding it on election day is a nonpublic forum.  As a nonpublic forum, the State must meet only a lenient standard: The government "may reserve such a forum for its intended

purposes, communicative or otherwise, as long as the regulation on speech is *reasonable* and *not an effort to suppress expression merely because public officials oppose the speaker's view.*"  *Mansky*, 585 U.S. at 12 (emphasis added).  Both sides agree that Act 728 does not suppress expression based on a speaker's view, i.e., it is content neutral. *See* Doc. 6, p. 9 and Doc. 48, p. 8.  The only question, as applied to Mr. Norris, is thus whether Act 728's ban on exit polling is "reasonable in light of the purpose served by the forum: voting."  *Mansky*, 585 U.S. at 13.  As the Court previously concluded, the answer is yes.  "Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation."  *Id*. at 15. The problems of "fraud, voter intimidation, confusion, and general disorder" undermine the public's ability to and confidence in their vote, and the State was within its constitutional limits in deciding that the time a voter spends in the 100 feet around a polling location should be a citizen's "own, as free from interference as possible."  *Id*. at 13–14.

But, Mr. Norris counters, this was not what the legislature was concerned about: he contends that the only concern expressed by legislators was "the need to counter the concrete problem of ostensibly non-partisan groups who had recently conducted covert electioneering while handing out food and drinks to people standing in line to vote."  (Doc. 53, p. 17).  Exit polling was not discussed, and the State cannot now defend Act 728 on post-hoc justifications concocted in litigation.

The Court's view, however, is that Mr. Norris misreads the legislative record.  Mr. Norris is correct that no legislator mentioned exit polling during debates on Act 728, but this is of no consequence.  The legislature need not address every conceivable application of a law for it to pass constitutional muster.  And the concerns that the State

now relies on—preventing intimidation, threat, improper influence, or coercion of voters—is *exactly* what the legislature discussed, even if the impetus for the discussion was groups handing out food and water rather than exit polling.  As mentioned above, proponents of the bill discussed creating a 100-foot "sacred zone" to prevent electioneering from occurring "under the pretense of goodwill."  *See* Doc. 44-7, pp. 4–5.  Justifications given for the zone included "preventing voters from being harassed or blocking an entrance," *id*. p. 6; upholding "election integrity at every single level," *id*. p. 8; and preventing people from congregating around the polling site, (Doc. 44-8, p. 8).  Senator Rapert spoke in favor of Act 728 because "it's hard to stop" electioneering when someone claims to be nonpartisan, so it was unfortunately necessary to bar the activity "wholly altogether."  (Doc. 44-7, p. 10).  Representative Brown made clear that the conduct the legislature was concerned about was not organizations "passing out water or sandwiches" which formed the basis of the citizen complaints, but instead all activities which "quite easily *could* be electioneering," as poll workers have "their hands full" enforcing election statutes.  (Doc. 44-8, pp. 4–5).

It is simply not the case, then, that the Court must look beyond the evidence attached to the Amended Complaint to find that the State's justifications for passing Act 728 were exactly of the sort described in *Burson*.  No legislator need use the words "this is an anti-influence statute" for the Court to conclude from their statements that this was, in fact, the thrust of their concerns.[2]  And as Mr. Norris admits, Arkansas legislators are

---

[2] For clarity, the Court is not relying on and need not rely on any evidence related to Mr. Reynolds's post-enactment arrest to make this determination.  The law is clear that a State's political system need not "sustain some level of damage before the legislature [can] take corrective action. Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively . . . ."  *Burson v.*

not required to present "elaborate, empirical verification of the weightiness of their asserted justifications" to justify their asserted regulatory interest. *Miller v. Thurston*, 967 F.3d 727, 740 (8th Cir. 2020) (cleaned up). Act 728's justifications were what the State says they were, and they meet the low bar for reasonableness in light of the forum's purpose (voting).[3]

Even under the stricter standard applicable to traditional public forums, though, Act 728 is constitutional.[4] In traditional public forums, the government may impose reasonable time, place, and manner restrictions on expressive activity so long as the restrictions are "content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication." *Burson v. Freeman*, 504 U.S. 191, 197 (1992). Act 728 meets these requirements.

As discussed, both parties agree that Act 728 is content neutral. A law is facially content-based when it "applies to particular speech because of the topic discussed or the

---

*Freeman*, 504 U.S. 191, 209 (1992). Mr. Norris's strategic choice to tether his case to one of only two people arrested for allegedly electioneering under Act 728 (and to then contract with Mr. Reynolds for Mr. Reynolds to conduct exit polling) is a bit puzzling, but of no consequence to this Order.

[3] Mr. Norris's opposition argues that his allegations that "exit polling does not disrupt the voting process, and that exit polling at a 100-foot distance is not viable) must be taken as true for purposes of this Order. If this argument is correct, this would affect the Court's analysis of whether the regulation is reasonable under the test for regulations in nonpublic forums (and multiple factors in the Court's time, place, and manner analysis). But the Court need not accept the allegations as true both because (1) Mr. Norris did not plead this; and (2) even if he had, it is not a well-pleaded fact, but a legal conclusion couched as a fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) ("A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.") Although Mr. Norris does allege that pollsters are *instructed* not to interfere with the election process, he does not allege that exit polling itself does not disrupt or interfere with the election process. *See* Doc. 44, ¶¶ 14–15.

[4] The Court's analysis that follows is largely duplicative of its prior order on Mr. Norris's motion for a preliminary injunction. *See* Doc. 39.

idea or message expressed." *Tiktok Inc. v. Garland*, 604 U.S. 56, 70 (2025) (citing *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Act 728 does not "target particular speech based upon its content." *Id*. at 71. It does not "impose a restriction, penalty, or burden by reason of content" on Mr. Norris or his campaign, nor can he and his campaign "avoid or mitigate" the effects of Act 728 by altering their speech. *Id*. Nothing about the Act regulates speech "because of the topic discussed, or the idea or message expressed." *Id*. The Act also does not restrict based on the identity of the speaker, with the exception of providing a carve-out for would-be voters. It does not distinguish between political speakers and other speakers, but instead forbids essentially *all* activity within 100 feet of a polling location. *See McCullen*, 573 U.S. at 465 (finding a geographic buffer zone around abortion clinics content neutral because "whether petitioners violate the Act depends not on what they say but simply on where they say it") (citation modified). The Act is clearly content neutral.

Act 728 also serves a significant government interest. As the *Burson* Court explained, regulations that impose restricted areas in or around polling places arise from issues in our country's earliest elections. During the colonial period, government officials were elected through a public show of hands, which presented opportunities for "bribery and intimidation" that led to its repeal. *Burson*, 504 U.S. at 200. States switched to paper ballots in response, but over time, political parties began to produce their own ballots for voters marked with "flamboyant colors, distinctive designs, and emblems" so that they were easily recognizable at a distance. *Id. The* earlier problems of bribery and intimidation thus "reinfected the election process," as vote buyers could watch voters as they placed the ballot in the polling box to ensure their bribe was effective. A voter's

experience at the ballot box was marked by "party ticket peddlers" engaged in heated competition, and all-in-all "these early elections were not a very pleasant spectacle for those who believed in democratic government." *Id*. at 202 (citation modified).

In the years that followed, countries across the world moved to the "Australian system" of voting, which provided for an official ballot with all candidates as well as polling booths open only to election officials, election monitors, and voters. *Id*. at 203. This system of restriction—intended to prevent "bribery, intimidation, disorder, and inefficiency at the polls"—made its way to the Untied States in 1888 as Louisville, Kentucky, the Commonwealth of Massachusetts, and the State of New York adopted the Australian system. *Id*. Massachusetts and New York only restricted the public from entering the six-foot area surrounding the voting compartments under the theory that it provided "additional monitoring by members of the general public and independent candidates, who in most States were not allowed to be represented by separate inspectors." *Id*. at 204. The New York statute, like Arkansas before Act 728, also prohibited any person from "electioneering on election day within any polling place, or within one hundred feet of any polling place." *Id*.

But as *Burson* recognizes, the Massachusetts and New York laws were but one choice among the many available. The Louisville law "prohibited all but voters, candidates, or their agents, and electors from coming within 50 feet of the voting room inclosure," or, in other words, prohibited more than just electioneering. *Id*. Similar laws were enacted across the United States, and "by 1896, almost 90 percent of the States had adopted the Australian system." Tennessee, like Louisville, Kentucky, initially forbid

15

everyone but voters and certain election officials from being "within 50 feet of the entrance" of the polling location in order to "secure the purity of its elections." *Id*. at 205.

So although *Burson* only dealt with statutes that forbid electioneering within 100 feet of a polling location, it also recognized that bills like Act 728 are rooted in our nation's history and tradition. Although the *Burson* court held—in response to an argument that the statute at issue there was underinclusive—that there was "simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses," it certainly did not reach the issues in this case. *Id.* at 207. As *Burson* recognized, intimidation and interference with voters may often go undetected and may drive away voters before remedial action can be taken. *Id*. at 205–06. Rerunning an election can negatively impact voter turnout, and the Supreme Court does not "necessitate that a State's political system sustain some level of damage before the legislature [can] take corrective action." *Id.* at 209. Moreover, "intimidation and interference laws" (or in this case, electioneering laws) "fall short of serving a State's compelling interests because they deal with only the most blatant and specific attempts to impede elections." *Id.* at 207 (citation modified). *Burson* cautioned that in election cases in particular, States need not prove that their regulations are "perfectly tailored to deal with voter intimidation and election fraud," because without prophylactic regulation, the State is left to deal with a tainted election, potentially reduced voter turnout, and damage to the political system. *Id*. at 209.

The State's interests in preventing fraud and interference in elections are undoubtedly significant in light of *Burson*'s warnings. And, in any event, the Court sees no basis for rejecting Arkansas determination that the polling place (and its immediate

16

vicinity) should be an "island of calm in which voters can peacefully contemplate their choices." *Mansky*, 585 U.S. at 15.

Finally, Act 728 is narrowly tailored towards that interest and leaves open ample alternatives for communication. "For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (citation modified). These regulations "*need not be the least restrictive or least intrusive means of serving the government's interests*," but the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. (citation modified) (emphasis added). The Court again notes that, in the context of voter regulations, a State's burden of proof is relaxed. *Burson*, 504 U.S. at 208–09. And like in *Burson*, the Court finds that both history and common sense indicate that Arkansas has sufficiently tailored its Act to protect speech rights. *Id*. at 211.

Under Act 728, exit pollers, refreshment purveyors, and any other speakers remain free to influence voters beyond the 100-foot mark. The Court is not persuaded by Plaintiffs' affidavits which suggest exit polling beyond 100 feet is not viable, nor does the Court accept this as a well-pleaded "fact" that must be accepted as true by the Court. (Docs. 44-2, 44-3). To the extent exit polling provides accurate information about the electorate, the Court disagrees that whatever marginal impact Act 728 might have on exit polling accuracy overrides Arkansas's interest in free and fair elections. One-hundred feet is six feet longer than a standard basketball court, roughly a third of a football field, and in many locations in Arkansas, likely no further than the walk from the polling location to the parking lot. Although Act 728 might complicate matters for Mr. Norris and his

17

campaign, the Court is not persuaded that it closes off all avenues of communication. While there may of course be some distance where Act 728 would present an impermissible burden on speech, "it is sufficient to say that in establishing a 100-foot boundary, [Arkansas] is on the constitutional side of the line." *Burson*, 504 U.S. 211.

To be clear, nothing in this opinion should be read to suggest that the Court believes the legislature's decision here to be *wise*. But in our system, judges and courts are meant to be "loyal adherents of the democratic idea, the sovereignty of a people expressing itself by representatives," and not wielders of "double axes" with one edge in "control over legislation by its unconstitutionality" and in the other "such free interpretation of statutes as suits their purposes." Learned Hand, Book Review, 37 Pol. Sci. Q. 149, 149 (1922) (reviewing Edouard Lambert, Le Gouvernement Des Juges Et La Lutte Contre La Législation Sociale Aux États-Unis (1921)). While there is "[n]o doubt our doctrine of constitutional law has had a tendency to drive out questions of justice and right," courts must leave to the legislature the "great range of possible harm and evil" they are entrusted with, else the government be made "petty and incompetent" by the checking and cutting down of legislative power. James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional* Law, Harv. L. Rev. 129, 155–56 (1893). Should the people of Arkansas decide that Act 728 is constitutional but unjust, they and their representatives have the power and responsibility to repeal it. "Under no system can the power of courts go far to save a people from ruin; our chief protection lies elsewhere." *Id*.

As the statute here passes constitutional muster, the Court's role is at its end. Under either the nonpublic forum analysis adopted by the Court here or the more stringent

18

standard applicable to public forums, Act 728 is constitutional. The State's Motion for Judgment on the Pleadings (Doc. 47) is **GRANTED**.

Finally, Mr. Norris has filed a motion for leave to amend his complaint. The proposed Second Amended Complaint adds new allegations that discuss the results of the 2026 primary election and clarify Mr. Norris's intentions to seek the Republican nomination for Arkansas Secretary of State in 2030, his plans to exit poll during the 2026 general election, and the means by which he will conduct that exit polling. Because the Second Amended Complaint is legally infirm for the same reasons as the First Amended Complaint—explained above—amendment would be futile. As such, Mr. Norris's Motion for Leave to File an Amended Complaint (Doc. 52) is **DENIED**.

## IV.    CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Judgment on the Pleadings (Doc. 47) is **GRANTED;** Mr. Norris's Motion for Leave to File an Amended Complaint (Doc. 52) is **DENIED**.

**IT IS SO ORDERED** on this 1st day of June, 2026.

_____
TIMOTHY L. BROOKS
CHIEF UNITED STATES DISTRICT JUDGE